## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Nicholas James, being first duly sworn on oath deposes and says:

1.      Your affiant, Nicholas James, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), Denver, Colorado, being duly sworn, states as follows:   Your affiant is an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510 (7) and is authorized by law to conduct investigations and make arrests for offenses in Title 18, United States Code, Section 2516.

2.      For the past several months your affiant and other agents and officers assigned to the DEA Front Range Task Force Group 1 (FRTF1) investigated a methamphetamine drug trafficking organization (DTO) involving an individual named Francisco CHAVEZ aka "J-1." As the investigation progressed agents learned of CHAVEZ's confidant and primary co-conspirator, Sergio MENDOZA-HURTADO. Most of the (undercover) meetings involving the negotiations for multiple pounds of methamphetamine involved a DEA Cooperating Source and CHAVEZ; however, by the end of this investigation officers identified other members of the DTO.

3.      The operational phase of this investigation culminated on October 2, 2012 with the arrests of Francisco CHAVEZ (year of birth 1978); Sergio Alonso MENDOZA-HURTADO (year of birth 1955); Aurora RODRIGUEZ-RIVAS (year of birth 1968); Heriberto VERDUGO-LEYVA (year of birth 1986); Moises PAEZ (year of birth 1987); (and one other who is not the subject of this affidavit); pursuant to the seizure

1

of approximately fifteen (15) pounds of methamphetamine that was delivered to a DEA Cooperating Source at the Los Agaves Mexican restaurant located at 1705 North Federal Boulevard, Denver, Colorado, on this same date.

4.    This affidavit details the actions of the suspects which occurred during the undercover operations on October 1 & 2, 2012, leading up to the suspect's arrests on October 2, 2012. The purpose of the undercover meeting on October 1, 2012, was for CHAVEZ to introduce the CS to CHAVEZ's methamphetamine Source of Supply (SOS), MENDOZA-HERTADO; and the purpose of the undercover meeting on the following day was to complete a multiple pound methamphetamine transaction; purported (by CHAVEZ and MENDOZA-HERTADO) to be 30 pounds of methamphetamine.

5.    Your affiant is aware that this CS has proven to be a reliable source of information; this CS has been documented with the DEA since 2001; this CS has a long-standing association with the Denver Police Department and has assisted other local law enforcement agencies.   Your affiant, in talking to other DEA Special Agents (and other law enforcement officers), has never known this CS to provide false information.   In addition, your affiant is also aware that this CS is familiar with the appearance, packaging and distribution methods of various "street" drugs to include cocaine, methamphetamine, heroin, marijuana and other illegal narcotics.

6.    On October 1, 2012, your affiant and other FRTF1 officers made arrangements for the CS to meet with CHAVEZ at the (aforementioned) Los Agaves Mexican restaurant; CHAVEZ requested the meeting for the purpose of introducing the CS to CHAVEZ's

methamphetamine SOS. On this day, FRTF1 officers monitored and recorded (audio) this undercover meeting, which involved the CS, CHAVEZ, MENDOZA-HURTADO and MENDOZA-HURTADO's "girlfriend" Aurora RODRIGUEZ-RIVAS.

7.      The following narrative of the suspects' conversations while inside the restaurant was heard from the audio transmissions and/or was related by the CS following this meeting. During the meeting, several phone calls were placed to CHAVEZ's "cousin" in Mexico, who reportedly was in Zacatecas, Mexico. The phone calls were placed and/or received from CHAVEZ's cellular phone and the CS's cellular phone and MENDOZA-HURTADO's "radio" (direct connect) phone. During the phone calls CHAVEZ's cousin talked with MENDOZA-HURTADO and CHAVEZ about the quantity and price of the methamphetamine and the manner in which he expected MENDOZA-HURTADO and CHAVEZ to complete the drug transaction with the CS. At the conclusion of the phone calls, CHAVEZ's cousin had authorized MENDOZA-HURTADO and CHAVEZ to sell 30 pounds of methamphetamine to the CS.

8.      Aurora RODRIGUEZ-RIVAS sat at the table with the others while these phone conversations took place. The CS perceived that RODRIGUEZ-RIVAS actively appeared to be listening and she seemed to be very interested concerning the content of the discussions. At some time during this (undercover) meeting, RODRIGUEZ-RIVAS complimented the CS concerning the CS's drug trafficking habits, remarking that the CS was "smart" (or a Spanish phrase very similar to that same effect) for dealing with drug traffickers who distribute large quantities of drugs. RODRIGUEZ-RIVAS said that dealing

with small-time drug traffickers increases the risk of being caught (arrested by law enforcement) and the financial rewards were small.

9.      RODRIGUEZ-RIVAS compared the CS's practices of drug trafficking to those of MENDOZA-HURTADO, explaining that MENDOZA-HURTADO also distributes large quantities of drugs to a few select buyers. RODRIGUEZ-RIVAS told the CS that MENDOZA-HURTADO interacts directly with the people he sells drugs to, cutting out the middleman. At one point during this meeting, MENDOZA-HURTADO made reference to RODRIGUEZ-RIVAS taking the "baby" back to Mexico after the methamphetamine transaction with the CS was completed. The CS explained that the comment is a play on words which (from the CS's perspective), means to drive the drug proceeds back to Mexico. The CS said that RODRIGUEZ-RIVAS gave an acknowledging smile after MENDOZA-HURTADO made the "baby" reference. CHAVEZ also told the CS that RODRIGUEZ-RIVAS had previously transported drug proceeds to Zacatecas, Mexico, for the DTO.

10.     On October 2, 2012, your affiant and other FRTF1 officers made arrangements for the CS to meet with MENDOZA-HURTADO, CHAVEZ and other DTO members for the purpose of completing the 30 pound methamphetamine transaction; the CS was equipped with an audio transmitter, which was monitored by TFO Joe Garcia; TFO Garcia is bilingual in the English and Spanish languages. This undercover meeting was video and audio recorded.

11.     During the early evening hours the CS (at the directions of FRTF1 officers) drove

4

to the Los Agaves Mexican restaurant. Prior to the arrival of the CS, FRTF1 members set

up in the area and were watching the restaurant.   When the CS arrived, CHAVEZ and

MENDOZA-HURTADO were all loitering around the parking lot of the restaurant,

RODRIGUEZ-RIVAS was seated inside a Nissan Pathfinder (this is the same Pathfinder

that agents observed the night before). All of these suspects had been inside the restaurant

minutes earlier, but came outside after the CS placed a phone call to CHAVEZ saying that

he/she would arrive shortly.

12.     The CS met CHAVEZ and MENDOZA-HURTADO in the parking lot and

engaged them in conversation concerning the 30 pounds of methamphetamine.

MENDOZA-HURTADO told the CS that the methamphetamine would be delivered

shortly to the restaurant. However, MENDOZA-HURTADO told the CS that it might be

necessary to relocate to another location for more privacy, because some of the

methamphetamine might be concealed in a compartment within a vehicle.

13.     Over the course of the next several minutes, MENDOZA-HURTADO placed a

couple of phone calls to two different couriers. While waiting, the CS engaged

MENDOZA-HURTADO and CHAVEZ in conversation, more or less re-hashing the

matter of finalizing the 30 pound methamphetamine transaction. A short time later, a

Hispanic male, later identified as Moises PAEZ, arrived at the restaurant driving in a Ford

Ranger pickup with a ladder strapped in the bed of the truck and other construction type of

equipment crammed inside the bed.

14.     MENDOZA-HURTADO and the CS engaged PAEZ in conversation concerning

5

the amount of methamphetamine that PAEZ brought. The CS asked to view the methamphetamine. PAEZ motioned to the bed of the Ford Ranger pickup and told the CS that the (methamphetamine) was concealed underneath a lot of the debris in the bed of the truck; PAEZ refused to show the CS the methamphetamine. MENDOZA-HURTADO interjected and told the CS that there were ten pounds concealed in the pickup; and PAEZ echoed MENDOZA-HURTADO's claim.

15.    Shortly after that, MENDOZA-HURTADO's second courier arrived at the restaurant, driving in a green Ford F-150 pickup with California license plates; the sole driver (later) identified as Heriberto VERDUGO-LEYVA, parked the pickup to the rear of the restaurant. MENDOZA-HURTADO and the CS engaged VERDUGO-LEYVA in conversation concerning the quantity of methamphetamine that he brought. VERDUGO-LEYVA explained that he only had the opportunity to "pull-out" (or words very similar to that same effect) some of the methamphetamine prior to driving to the restaurant;   VERDUGO-LEYVA told MENDOZA-HURTADO and the CS that he needed a "jack" and a few other tools to open (the compartment) concealed within the pickup to retrieve the rest of the methamphetamine. VERDUGO-LEYVA said that he had all of the necessary tools to open the compartment to gain access to retrieve the methamphetamine. Your affiant notes that VERDUGO-LEYVA's pickup did contain an assortment of tools, to include a welder, various wrenches, screwdrivers, grinders, etc.

16.    MENDOZA-HURTADO told the CS that together the two pickup trucks contained a total of "30 pounds" of methamphetamine; ten pounds in the Ford Ranger pickup and 20

pounds in the green Ford F-150 pickup. Shortly thereafter, officers responded to the restaurant and placed all six of the suspects into custody. All of the suspects were advised of the Miranda Warnings and all acknowledged that they understood their rights.

17.      Pursuant to the arrests of the suspects, officers found approximately ten pounds of suspected methamphetamine contained inside ten plastic Tupperware containers further contained inside two five gallon plastic buckets found inside the bed (passenger-side) of the Ford Ranger pickup driven by PAEZ.   Officers seized approximately five pounds of suspected methamphetamine which was contained inside a long clear plastic bag, further contained inside a black colored plastic trash bag with insulation sheeting, further contained inside a brown pillow case, which was packed in a hard-shell suitcase that was situated in the rear passenger section of the Ford F-150 pickup, driven by VERDUGO-LEYVA. Presumptive tests were completed on the suspected methamphetamine, which tested positive for methamphetamine. Shortly thereafter the suspects were transported to the Denver City Jail.

Based on the above information, your affiant believes that Francisco CHAVEZ, Sergio Alonso MENDOZA-HURTADO, Aurora RODRIGUEZ-RIVAS, Heriberto VERDUGO-LEYVA, and Moises PAEZ are involved in a conspiracy to distribute methamphetamine and possession of methamphetamine with the intent to distribute it.

Based on the foregoing affidavit, I respectfully request a complaint be issued for violations of Title 21, United States Code, Sections 841 (a) (1) and 846, conspiracy to

distribute and possession with intent to distribute a controlled substance.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 10th day of October 2012, at Denver, Colorado.

s/Nicholas A. James
Nicholas A. James
Task Force Officer
Drug Enforcement Administration

**Oct 10, 2012 1:10 pm**
Sworn and subscribed to before me this _____ day of October, 2012.

UNITED STATES MAGISTRATE JUDGE
**Kathleen M. Tafoya**
**United States Magistrate Judge**

**Affidavit reviewed and submitted by Mark J. Barrett, Assistant United States Attorney.**